**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARICE WALL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 06 C 1109** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | **Magistrate Judge Nan R. Nolan** |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.[1]** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marice Wall seeks judicial review of the final decision of the Defendant Commissioner of Social Security finding Wall not disabled. Cross motions for summary judgment are pending. For the reasons stated below, Plaintiff's Motion for Summary Judgment or Remand [19] is denied and Defendant's Motion for Summary Judgment [22] is granted.

## I.    Procedural History

On October 16, 2002, Wall applied for Disability Insurance Benefits and Supplemental Security Income, alleging she became disabled on June 1, 2002 due to chronic fatigue and depression. (Tr. 65-67, 90, 326-28). Wall's applications were denied initially on March 14, 2003 and upon reconsideration on July 8, 2003. (R. 26, 27, 28-32, 34-37). On August 29, 2003, Wall filed a Request For Hearing By Administrative Law

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the Defendant in this action.

Judge.  (R. 38-42).  On May 26, 2005, the ALJ issued a decision finding Wall not disabled and denying her request for benefits.  (R. 16-25).  Wall filed a Request for Review of the ALJ's decision denying her claim for benefits.  (R. 11-12).  On November 25, 2005, the Appeals Council denied Wall's request for review.  (R. 6-8).

## II.    Factual Background

### A.    Background and Wall's Testimony

Wall was 42 years old at the time of the hearing.  (R. 344).  Wall completed three and a half years of college.  Id.  She previously worked as a legal secretary/assistant and an executive assistant.  (R. 345).

At the hearing, Wall testified that she struggles to do things and cannot remember things.  (R. 345).  She said her blood sugar is not stable and her blood pressure is low.  Id. She further testified that she has difficulty keeping track of dates and bills, talking drains her energy, and her daughter was often late for school because is hardest for her to function in the mornings.  Id.  Wall reported that she sees Dr. Green approximately once a month to have her blood pressure and heart checked.  (R. 346).  Wall takes prenatal vitamins and herbs but no prescription medications.  (R. 346-47).  Dr. Green instructed Wall to walk and go to the health club to help with her fatigue.  (R. 353).  Wall testified that she tries to do exercises she watches on television.  Id.  Wall explained that she has trouble hearing out of her left ear but does not wear a hearing aid.  (R. 348-49).

Dr. Green referred Wall to psychologist Keating.  (R. 347).  Wall has seen Keating two to three times a month for two years prior to the hearing.  (R. 348).  Keating has not recommended anti-depressants.  (R. 352).  Wall added that she could not afford the St. John's Wort she was supposed to take for depression.  Id.  Wall stated that her condition

had improved, but she still has some very bad days. (R. 360). Wall said Keating told her that she does not handle stress well. Id. Wall testified that her activities include helping her daughter get ready for school, taking her daughter to school if she misses the bus, grocery shopping with her daughter's assistance, going to church, and sometimes fixing dinner. (R. 353-54, 357-58). Wall drove 30 minutes to the hearing. (R. 347-48).

### B. Medical Evidence

On June 16, 2002, Wall was treated in the Ingalls Memorial Hospital Emergency Department with "vague complaints" of a burning sensation to the abdomen wall, low blood and low sugar. (R. 174). The lab work did not support Wall's complaints. (R. 178). Wall stated that she was under a lot of stress. Id. Wall was not depressed. (R. 175). There was no suicidal ideation and no homicidal ideation. Id. Wall was not taking any psychiatric medications. (R. 178). She appeared sluggish, weak, and pale. (R. 175). Wall's breath and heart sounds were normal. Id. There was no edema, and her abdomen was non-tender. (R. 175-76). Wall's gait was normal and she had normal motor, sensory, and reflex findings. (R. 176). Wall was oriented but her judgment was poor. Id. She was slightly confused, delusional and illusional. Id. Dr. Muhammed Awan described Wall's behavior as "bizarre." (R. 176). She was diagnosed with generalized anxiety disorder, assigned a GAF of 30, and transferred to Tinley Park Mental Health Center for treatment. (R. 176, 181).

On June 25, 2002, Wall was tested for physiological indicators because of epigastric pain and was found to have hyperexpanded lungs. (R. 185). The test results indicated:

Saliva pH: extremely depressed     Mitochondrial: moderately stressed

Saliva redox: depressed     Lymphatic: extremely stressed

| | |
|---|---|
| Saliva r:  extremely depressed | Circulatory:  moderately stressed |
| Urine pH: extremely depressed | Liver:  extremely stressed |
| Urine redox: extremely depressed | Adrenal:  extremely stressed |
| Urine r: extremely increased | Kidney:  extremely stressed |
| Saliva resistivity:  low | Digestive:  moderately stressed |
| Urine resistivity:  high | Heavy metals:  moderately stressed |
| Minerals:  moderately stressed | Thyroid: moderately stressed |
| Interstitial:  extremely stressed | Immune: moderately stressed |
| Cellular:  slightly stressed | |

(R. 185-96).  The results from Wall's saliva redox test were described as a "very rare scenario." (R. 188).  The low saliva resistivity and high urine resistivity indicated that Wall's kidneys were not cleansing the lymphatic system and the interstitial fluid adequately and that the remaining detoxification organs of the body were unable to compensate.  (R. 190). The congestion in Wall's body was making it very difficult for the cellular metabolic waste products to be removed and for proper nutrition into the cells, resulting in lower energy production and a generalized feeling of fatigue and sluggishness.  Id.  Test results on August 9, 2002 were very similar.  (R. 198).  Wall was advised that her glands and kidneys were stressed and worn.  Id.  She was instructed to keep working on nourishing them.  Id.

On August 19, 2000, Wall had a hearing test.  (R. 203).  She was found to have mixed hearing loss, sensorineural and possible effusion.  Id.  The physician recommended a hearing aid evaluation, myringotomy and tubes first, and then later, a stapedectomy if the mixed pattern persists.  Id.  Wall declined further treatment.  Id.

On September 30, 2002, Lisa Green, M.D., Wall's primary care physician, diagnosed Wall with chronic fatigue syndrome and depression. (R. 207). Between September 30, 2002 and December 29, 2004, Wall saw Dr. Green twenty-three times. (R. 252-85). Most of the visits were follow-ups regarding Wall's chronic fatigue. Dr. Green recommended supportive care and therapy for Wall's chronic fatigue and depression. (R. 254-61, 264, 268-78, 281, 285).

Alan W. Jacobs, Ph.D., performed a consultative psychological evaluation on February 12, 2003 (R. 208-10). Wall reported having difficulty caring for her children. (R. 209). Wall said she had been suffering from depression and chronic fatigue syndrome since the summer of 2002. Id. Wall stated she was taking herbs but no other medicines. (R. 208). Wall lived with her children and was responsible for all chores. (R. 209). Wall said she had a number of court battles regarding custody of her children over the last several years. Id. Wall denied any manic symptoms or hallucinations. Id. She denied any prior history of psychological treatment. Id. Wall had a good appetite. She described her sleep as fair and stated she frequently napped during the day because she was so tired. Id. Wall drove a car, recently started going to church, had regular contact with her children's father, and occasionally visited her sister. Id.

Dr. Jacobs noted that Wall wore heavy winter clothing and spoke through the top of her turtleneck sweater until he asked her to pull it down. Id. Dr. Jacobs described Wall as cooperative but anxious. Id. Wall spoke softly and demonstrated fair grammar and vocabulary as well as enunciation. Id. When Jacobs focused on Wall's chronic fatigue and depression, Wall became tearful, cried, and overall appeared moderately depressed with accompanying anger and feelings of abandonment by her friends and family. (R. 210).

Wall's long-term memory was fair for dates, times, and events. Id. Her short-term memory was good. Id. She was able to remember three of three items after five minutes, repeated four digits forward and three backwards, and did single digit multiplication but had trouble with serial seven subtractions. Id. Wall's thinking was free of delusion, paranoia, and grandiosity. Id. She had no looseness of association, flight of idea, or circumstantiality. Id. Dr. Jacobs indicated that Wall was likely functioning within the normal range of intellectual capacity. Id. He diagnosed her with moderate major depression and a history of chronic fatigue syndrome. Id.

Stanley Rabinowitz, M.D., examined Wall on February 12, 2003. (R. 211-13). Wall complained of family stressors, including caring for her ill father. (R. 211). Dr. Rabinowitz noted that Wall "was thin, chronically ill-appearing, and mildly depressed appearing." (R. 212). With the exception of a history of scoliosis and impaired range of motion of the lower back, the findings of Wall's physical examination were normal. (R. 211-13). Wall was also oriented, related appropriately, had intact memory, and showed no abnormal thought processes or autonomic hyperactivity. (R. 212). Dr. Rabinowitz diagnosed a history of chronic fatigue, history of major depression, and history of lumbothoracic scoliosis. (R. 213). Dr. Rabinowitz opined that Wall's chronic fatigue was probably secondary to major depression. Id.

On March 3, 2003, a state agency psychologist Erika B. Altman, Ph.D., reviewed the evidence and opined that Wall's ability to perform work-related activities was not significantly limited, except that she was moderately limited in her ability to maintain attention and concentration for an extended period and to accept instructions and respond appropriately to criticism from supervisors. (R. 215-16). Dr. Altman further opined that

Wall's difficulties in maintaining concentration, persistence, or pace was mild and her difficulties in maintaining social functioning was moderate. (R. 223). Dr. Altman diagnosed major depression, moderate. (R. 220). Dr. Altman noted that Wall was in treatment with a psychologist for her depression but was not on psychotropic medication. (R. 217). Dr. Altman opined that Wall's activities of daily living were "somewhat limited." Id. Wall's depression limited her ability to perform complex, detailed tasks but she was capable of performing simple, routine tasks. Id.

On August 30, 2003, Albert R. Keating, M.A., LCPC, of Family Christian Health Center, completed a Mental Residual Functional Capacity Questionnaire stating that he had seen Wall for counseling nearly every two weeks over the preceding year. (R. 226-230). He diagnosed major depressive disorder and assessed Wall's current GAF at 55 and her highest GAF over the past year at 59. Id. He noted that Wall used no pharmaceutical medications. Id. Keating wrote that Wall responded in a lethargic manner, her level of distress was moderate to severe, her eye-contact was fair, her speech was slow and very soft, her mood was depressed, and her affect was restricted. Id. Keating stated that Wall was extremely thin but not thought to be anorexic. Id. She was talkative at times and unresponsive at other times. Id. Wall's thought processes were usually logical, but frequently tangential. Id. On a checklist of symptoms, Keating indicated that Wall experienced: anhedonia or pervasive loss of interest; appetite disturbance with weight loss; decreased energy; blunt, flat, or inappropriate affect; poverty of content of speech; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; psychomotor retardation; hearing disturbance; isolation; emotional ability; flight of ideas; memory impairment; and decreased need for sleep. (R. 227).

Keating opined that Wall's mental abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and respond appropriately to changes in a routine work setting were seriously limited, but not precluded. (R. 228). Wall's mental abilities to perform at a consistent pace without an unreasonable number and length of rest periods and deal with normal work stress was seriously limited, but not precluded to unable to meet competitive standards. Id. Wall had an unlimited or very good ability to maintain socially appropriate behavior. (R. 229). All other work-related mental activities were assessed as limited but satisfactory. (R. 228-29). Keating wrote that Wall's "level of fatigue as well as her depression would significantly interfere from a normal routine work day." (R. 228). He added that when her depressive symptoms were elevated, she perceived her fatigue in a more exaggerated manner. (R. 229). Keating estimated that Wall's impairments would cause her to be absent from work more than four days per month. (R. 230). Keating also indicated that Wall was not a malingerer. Id. He concluded:

> Withstanding the absence of malingering, this patient's ability to remain consistent with any occupational task would be moderate to severely limited. There are days when patient is unable to feed self and has others assist her with most household chores. If she struggles with everyday living skills, she most certainly [would] have significant challenges with work-related tasks.

(R. 230).

A Hamilton Rating Scale for Depression assessment dated December 6, 2004 apparently completed by psychology Keating indicates Wall had the following symptoms of depression: depressed mood communicated through non-verbal actions; self reproach; nightly difficulty falling asleep; waking during the night, waking in early hours of the morning but going back to sleep; decreased activities or productivity; difficulty completing the interview; difficulty sitting still; apprehensive attitude; moderate anxiety; loss of appetite;

loss of energy and fatigability; mild loss of libido; frequent complaints and requests for help; probably weight loss associated with present illness; and mild obsessional and compulsive symptoms.  (R. 233-34).

On February 14, 2005, Keating completed another Mental Residual Functional Capacity Questionnaire.  (R. 321-25).  He indicated Wall's current GAF was 59 and her highest GAF was 63 over the past year.  (R. 321).  Keating stated that Wall "generally responds well to supportive cognitive behavioral therapy." Id.  He noted that she used no pharmaceutical medications.  Id.  He further noted that Wall's affect and mood fluctuated and her tangential thinking often appeared discouraged and fatigued.  Id.  She was underweight.  Id.  Keating believed Wall's prognosis was fair.  Id.  On the symptoms checklist, Keating checked the same items as on the August 2003 questionnaire, except he also checked the sleep disturbance item and he did not check the somatization unexplained by organic disturbance, the memory impairment, and the decreased need for sleep items.  (R. 322).  He rated Wall's ability to perform the following activities as seriously limited but not precluded: complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; and deal with stress of semiskilled and skilled work.  (R. 323-24).  He opined that Wall had unlimited or very good ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation.  (R. 324). All other work-related mental abilities were rated as limited but satisfactory.  (R. 323-24). Mr. Keating wrote that Wall had physical symptoms when she perceived greater stress, became fatigued easily and with little effort, and would miss more than four days a month

due to her impairment.  (R. 324-25).  The record also contains a copy of the August 30, 2003 questionnaire completed by Keating with the date changed to February 25, 2005.

### C.    Vocational Expert's Testimony

The Vocational  Expert ("VE") testified that Wall's past relevant work as a legal secretary/assistant and an executive assistant is semi-skilled at the light or sedentary level of physical tolerance.  (R. 361).  The VE stated that a hypothetical person with Wall's work experience, education, and age and the residual functional capacity to do light work limited to only superficial interaction with others, no work in close proximity to others, and simple, unskilled tasks that can be learned on demonstration or within 30 days would not be able to perform Wall's past jobs but could perform light, unskilled jobs of janitor or custodian (9,800 jobs in the region) and mail sorter (7,800 jobs in the region).  (R. 362-63).

The VE further testified that if a hypothetical person with Wall's work experience, education, and age with an inability to perform at a consistent pace without an unreasonable number and length of rest periods, inability deal with normal work stress, poor coping skills, inability to adjust to job instructions, inability to complete a normal workday and workweek without interruption from psychologically based symptoms, inability to respond appropriately to changes in a routine work setting, and would miss more than four days of work a month would be unable to perform substantial gainful activity.  (R. 363-64).  The VE also stated that most employers would only tolerate 1.75 days off per month. (R. 364).

### D.    ALJ's Decision

The ALJ found that Wall suffers from major recurrent depression with schizoid traits which is a severe impairment but does not meet or equal a listed impairment. (R.19). The ALJ further found that Wall's impairments would not be expected to cause the intensity or restriction she asserts. (R. 23). The ALJ denied Wall's claim at step five, finding that she retained the residual functional capacity to perform the exertional requirements of light work with the following additional restrictions: simple, unskilled work, learnable in 30 days or on short demonstration, involving only superficial contact with others, that could be performed independently, and not in close coordination with others. (R. 24).

## III.    DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other

than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Wall's claim at Step 5, finding that she retained the residual functional capacity to perform a range of light work. Wall raises five main challenges to the ALJ's decision: (1) the ALJ erred in concluding that Wall's chronic fatigue is not severe; (2) the ALJ improperly determined that Wall did not meet any Listings; (3) the ALJ improperly discredited psychologist Keating's opinion; (4) the ALJ's credibility finding did not comply with SSR 96-7p and 20 C.F.R. § 404.1529; and (5) the ALJ's step five determination is not supported by substantial evidence. Wall's arguments do not warrant reversal or remand.

## A.    Step Two

Wall contends that the ALJ erred at step two of his analysis because he failed to conclude that Wall's chronic fatigue syndrome is a severe impairment. A "severe" impairment is "any impairment or combination of impairments which significantly limits [the claimaint's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

The ALJ found that Wall's major recurrent depression with schizoid traits was a severe impairment at step two. (R. 18). The ALJ further found that Wall's chronic fatigue did not cause more than a minimal impact upon her functioning. (R. 23). Wall says she clearly suffers from chronic fatigue which is more than a slight abnormality and which causes more than a minimal effect on her ability to do work.

Even if the ALJ erred in finding Wall's chronic fatigue to be a non-severe impairment, it would not warrant a reversal or remand of the ALJ's decision. Step two is a threshold determination which requires Wall to show only that she has one severe impairment. Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003) (stating "[h]aving found that one or more of [claimaint's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of this entire constellation of aliments–including those impairments that in isolation are not severe."); Hickman v. Apfel, 187 F.3d 683, 688 (7th Cir. 1999) (stating "it is quite apparent that severity is merely a threshold requirement."). The ALJ found Wall's depression severe at step two and properly proceeded with the sequential analysis considering all impairments, including those which were not found to be "severe" at step two. Clifford, 227 F.3d at 868 (indicating "[a] negative answer at any point, other than step 3, ends the inquiry and leads to a determination that the claimant is not disabled."). Because the ALJ considered all of Wall's impairments throughout the evaluation process including in determining her residual functional capacity, the ALJ's finding that Wall's chronic fatigue syndrome was not a severe impairment does not constitute reversible error. The critical issue on appeal is whether substantial evidence supports the ALJ's finding that Wall retained the residual functional capacity to perform _a range of light work.

Wall also argues that the ALJ did not consider the effects of her impairments in the

aggregate in considering her RFC.  See 42 U.S.C. § 423(d)(2)(B) (requiring consideration

of the "combined effect of all of the individual's impairments without regard to whether any

such impairment, if considered separately, would be of [sufficient] severity."); 20 C.F.R. §

404.1523.  This argument dovetails into the analysis of the adequacy of the ALJ's RFC and

step five determinations, which is discussed below.

**B.      Step Three - Listing 12.04**

Wall next challenges the ALJ's finding that her depression with schizoid traits does

not meet or equal Listing 12.04.  The ALJ determined that Wall did not meet the criteria of

Listing 12.04 (affective disorders)  "The Listing describes impairments that are considered

presumptively disabling when a claimant's impairments meet the specific criteria described

in the Listing."  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  Wall bears the burden

of demonstrating that her condition meets all of Listing 12.04's requirements.  Id.  To meet

Listing 12.04, Wall had to meet the criteria in both paragraphs A and B or meet the criteria

of paragraph C.  Wall does not challenge the ALJ's finding that the C criteria of Listing

12.04 were not met.  (R. 22).  Wall contends that her depression met the A and B criteria.

The criteria in paragraph B describe "functional limitations that are incompatible with

the ability to do any gainful activity."  20 C.F.R. Subpt. P., App. 1, § 12.00(A).  To meet the

B criteria, Wall must establish that her depression resulted in at least two of the following:

(1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social

functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; (4)

repeated episodes of decompensation, each of extended duration.  Listing 12.04B.

"Marked" means more than moderate but less than extreme.  Listing 12.00(C).  "A marked

limitation may arise when several activities or functions are impaired, or even when only

one is impaired, as long as the degree of limitation is such as to interfere seriously with [claimaint's] ability to function independently, appropriately, effectively, and on a sustained basis." Id.

The ALJ's finding that Wall did not meet her burden of showing that the B criteria were met is supported by substantial evidence.  The ALJ found Wall had minimal restrictions in activities of daily living, moderate difficulties in interacting appropriately with others, and moderate difficulties in maintaining concentration, persistence and pace.  (R. 23).  Wall does not contend that she satisfies the limitations in §§ 12.04(B)(2) and (4).  Substantial evidence supports the ALJ's finding that Wall's condition only led to minimal restrictions in activities of daily living.  Wall reported that she cooked three meals a day, did laundry and dishes as needed, was independent in her personal care, was able to leave home alone, drove a car, took care of her daughter, drove her daughter to and from school five days a week, managed her finances, and attended church.  (R. 22-23, 112-14, 118, 126-28).  She shopped for groceries two to three times a month, talked on the phone, talked to her neighbors, ran errands, and watched television. (R. 112-14, 118, 126-28). Wall drove to the hearing alone.  (R. 23, 347-48).  Wall told Dr. Jacobs that she was responsible for all household chores, including pet care, she attends church, and drives. (R. 22, 209); see Hilkemeyer v. Barnhart, 380 F.3d 441, 446 (8th Cir. 2004) (upholding ALJ's finding that claimant's disorder only led to slight restrictions in the activities of daily living under § 12.04(B)(1) where claimant testified she was able to do minor household chores, drive to her doctor's appointments, and go grocery shopping with the help of her daughter).

Furthermore, a Dr. Altman, a state agency reviewing psychologist, found that Wall's

activities of daily living was only "somewhat limited." (R. 217). The ALJ may properly rely upon the opinion of state agency physicians to determine medical equivalence. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2000) (stating "it is appropriate for an ALJ to rely on the opinions of [state agency] physicians and psychologists who are also experts in social security disability evaluation."); 20 C.F.R. § 404.1527(f). Wall points out that she feels fatigued when performing activities of daily living and it takes her longer than before to complete such tasks (see Pl's Memo. at 13-14), but Wall need not be completely free from fatigue to have the ability to engage in substantial gainful employment.

Substantial evidence also supports the ALJ's determination that Wall had only moderate difficulties in maintaining concentration, persistence and pace. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Subpt. P., App. 1, § 12.00(C)(3). Dr. Altman found Wall moderately limited in her ability to maintain attention and concentration for extended periods but "not significantly limited" or "no evidence of limitation in this category" in all other areas of sustained concentration and persistence. (R. 215). Dr. Altman concluded that Wall's depression limited her ability to engage in complex, detailed tasks but that she was capable of performing simple, routine tasks. (R. 217). Overall, Dr. Altman rated Wall's degree of limitation in the area maintaining concentration, persistence or pace as mild. (R. 223). Moreover, Dr. Jacobs concluded that Wall's long-term memory was fair for dates, times, and events. (R. 210). Wall's short-term memory was good being able to remember three of three items after five minutes, repeat four digits forward and three backwards, and correctly perform simple calculations. Id. Dr. Rabinowitz also noted that Wall's memory

was intact. (R. 212).

As the ALJ observed, when Wall was hospitalized and at her lowest point psychologically, she was focused and had intact recent and remote memory and normal train of thought. (R. 19-20, 176, 180). Finally, on his most recent RFCs, Keating found that Wall was limited but satisfactory in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, and sustain an ordinary routine without special supervision. (R. 323, 325I). On February 25, 2005, Keating found Wall's ability to maintain attention for a two-hour segment "limited but satisfactory." (R. 325I). Keating also found on February 14, 2005 that Wall's ability to perform at a consistent pace without an unreasonable number and length of rest periods seriously limited, but not precluded. (R. 323). This evidence supports the ALJ's finding that Wall's ability to maintain concentration, persistence, and pace was moderately, not markedly, limited. Because substantial evidence supports the ALJ's finding that Wall's mental impairments did not meet two of the four areas of functioning listed in paragraph B of Listing 12.04, the ALJ's step three finding is upheld.

### C. Weight Afforded Psychologist Keating's Opinion

Wall next argues that the ALJ erred in his evaluation of psychologist Keating's opinion. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." Hofslien v. Barnhart, 439 F.3d 375 (7th Cir. 2006). A claimant is not disabled simply because his treating physician says so. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."

Id. (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)).  If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including:  the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist.  20 C.F.R. § 404.1527(d)(2)-(5).

Psychologist Keating indicated on August 30, 2003 that he had seen Wall nearly every two weeks for a year.  (R. 226).  In August 2003 and February 2005, he indicated that Wall's prognosis was fair.  (R. 321, 325G).  Keating also opined that Wall's impairments would cause her to be absent from work more than four days per month.  (R. 325, 325K).  In August 2003 and February 2005, Keating stated that Wall's ability to remain consistent with any occupational task would be moderate to severely limited.  (R. 230, 325K).  He also stated that there are days when she is unable to feed herself and has others assist her with most household chores.  Id.  Keating indicated that Wall's "current cognitive and emotional functioning is rather erratic and it would be difficult for her to participate in any tasks beyond basic functioning."  (R. 229, 325J).  Keating concluded: "If she struggles with everyday living skills, she most certainly would have significant challenges with any work-related tasks."  (R. 230, 325K).

The ALJ assigned Wall a moderate restriction in a number of areas of mental functioning (i.e., interacting appropriately with others requiring a setting involving only superficial exhcanges and communications where she can work independently and not in

close coordination with other and concentration, persistence, and pace requiring unskilled and routine work that she can learn on simple demonstration or in less than 30 days), which is partially consistent with Keating's findings. The ALJ failed to give controlling weight to psychologist Keating's opinions that Wall would be moderately to severely limited in her ability to remain consistently on *any* occupational task and would have more than four monthly work absences because Keating's opinions were internally inconsistent and inconsistent with other evidence in the record. (R. 20-21). The ALJ recognized that his RFC findings contradicted those of Keating, in part, and recognized the deference generally accorded to the treating physician's opinion. (R. 20-21).

The ALJ's decision to reject as controlling psychologist Keating's opinions of moderate to severe limitation in the ability to remain consistent on *any* occupational task and more than four monthly work absences and place greater weight upon the opinions of the non-examining state agency medical consultants is supported by substantial evidence. The ALJ properly discounted Keating's opinions because they were internally inconsistent. For instance, the ALJ noted that it was materially inconsistent to find Wall completely precluded from dealing with work stresses (R. 325I), but at the same time find that she was seriously limited, but not precluded from dealing with the stress of semi-skilled or skilled work, which requires higher tolerance thresholds. (R. 325K). The ALJ further noted that Keating's opinion that Wall would have "significant challenges with *any* work-related tasks" was inconsistent with his opinion that same month that Wall has unlimited abilities to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. (R. 324, 325K). The ALJ also indicated that Keating assigned Wall GAF scores indicating only moderate symptoms. (R. 21, 226,

325, 325G).  Moreoever, on February 14, 2005, Keating indicated that Wall "generally responds well to supportive cognitive behavioral therapy."  (R. 321).  Further, the ALJ properly noted that Keating holds a master's degree and is not a licensed psychologist.  (R. 21); 20 C.F.R. § 404.1527(d)(5).  The ALJ appropriately relied on the nonexamining source opinions that Wall was moderately restricted in her degree of limitation.  (R. 21, 223).  Accordingly, the ALJ's decision to accord Keating's opinions of severe restriction and more than four absences per month limited weight was proper.

Wall argues that the ALJ erred in failing to recontacted Keating and failing to obtain a medical source statement ("MSS") from the consultative examiners.  "An MSS explains what an individual can do despite severe impairments, 'in particular . . . an individual's physical or mental abilities to perform work-related activities on a sustained basis.'"  Skinner v. Astrue, 478 F.3d 836, 843 (7th Cir. 2007) (quoting SSR 96-5p).  "ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability, though '[a]djudicators are generally required to request that acceptable medical sources provide [MSSs] with their medical reports.'"  Id.

Wall contends that the ALJ should have recontact psychologist Keating if he had a question about the consistency of his opinion.  Wall relies on 20 C.F.R. § 404.1512(e) and SSR 96-5p for this argument.  "Contrary to plaintiff's contention, the regulations do not require the ALJ to recontact the treating physician simply because he may have provided evidence that is internally inconsistent or inconsistent with other evidence in the record."  Perkins v. Massanari, 2001 WL 34382041, at * 11 (W.D. Wis. Aug. 22, 2001).  Similarly, "SSR 96-5p does not require the agency to recontact a treating physician when his opinion

is internally inconsistent or inconsistent with other medical evidence in the record. See, *e.g.*, SSR 96-2p ('Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed.')." Shinabarger v. Barnhart, 2006 WL 3206338, at *12 (S.D. Ind. March 31, 2006). Rather, an ALJ is required to recontact a medical source "only when the evidence received is inadequate to determine whether the claimant is disabled." Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(e)). "[T]he regulations provide that '[i]f any of the evidence in [the claimant's] case record, including any medical opinions(s), is inconsistent with other evidence or is internally inconsistent, [the ALJ] will weigh all of the evidence and see whether [he] can decide whether [the claimaint is] disabled based on the evidence [in the record]." Perkins, 2001 WL 34382041, at * 11.

Here, it was not necessary to recontact psychologist Keating. Keating's opinion was not incomplete or in need of clarification. The ALJ acted within his discretion in concluding that the evidence was sufficient to make a disability determination and in deciding to partially discredit Keating's opinion. Skarbek, 390 F.3d at 504 (holding ALJ acted within his discretion by not recontacting treating physician whose opinion was not supported by x-rays or his own progress notes and was contradicted by physicians who saw claimaint only once).

The ALJ also did not err in not obtaining a MSS from the consultants who examined Wall. Although the ALJ is "generally required to request that acceptable medical sources provide these statements with their medical reports," (see SSR 96-5p), the applicable

regulation states that the "lack of the medical source statement will not make the report incomplete." 20 C.F.R. § 404.1513(b)(6). Even if the ALJ should have requested a MSS from the consultants, his failure to do so is not reversible error. Substantial evidence in the existing record supports the ALJ's decision. The record includes findings by nonexamining state agency medical consultants, Erika B. Altman, Ph.D., and L.M. Hudspeth, Psy.D, which support the ALJ's conclusion that Wall is not disabled. (R. 215-225). These medical consultants made findings regarding Wall's abilities to perform work-related activities. (R. 215-17). Medical Source Statements would provide the same information. SSR 96-5p (stating MSSs are medical opinions about "an individual's physical or mental abilities to perform work-related activities on a sustained basis."). Finally, the Court is persuaded that medical source statements from Drs. Jacobs and Rabinowitz would not undermine the ALJ's determination of moderate restriction in several areas of Wall's mental abilities because Dr. Jacobs diagnosed moderate major depression and Dr. Rabinowitz referred to Dr. Jacob's report for details regarding Wall's depression. (R. 210, 213).

### D.     Wall's Credibility

Wall next argues that the ALJ's adverse credibility finding violates SSR 96-7p and 20 C.F.R. § 404.1529. The ALJ found that Wall's impairments "would not be expected to cause symptoms of the intensity or restriction that she asserts . . . ." (R. 23). SSR 96-7p states that ALJs must provide "specific reasons" for a credibility finding. ALJs must also evaluate the credibility of the claimant's testimony about her symptoms in light of seven factors: (1) daily activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other

factors concerning functional limitations.  SSR 96-7p.  An ALJ's credibility determination is entitled to "special deference" and will be reversed only if it is "patently wrong."  Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004);  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ provided sufficient support for his finding that Wall was not credible regarding her allegation of total disability, and his finding is supported by substantial evidence.  The ALJ noted the discrepancy between Wall's assertion of disability and her routine ability to perform daily activities such as driving, exercising, and going to church, her daughter's school and the grocery store.  (R. 23).  For example, the ALJ noted that Wall drove herself to the hearing which took 30 minutes.  Id.  The ALJ also properly observed that since her June 2002 mental health hospitalization, Wall received only conservative care.  Id.  The ALJ further noted that Wall's own primary care physician indicated that her depression was stable.  Id.  The ALJ also considered the fact that Wall takes no prescription medication.  (R. 20, 23).  The absence of prescription psychotropic medications supports the ALJ's credibility findings.  See Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (evidence that claimant "relied for pain control on over-the-counter analgesics" supports conclusion that pain is not disabling.); Powers, 207 F.3d at 435-36 (reliance on drugs not intended to treat severe pain suggests claimant may be exaggerating condition).  Wall's treatment efforts and lack of prescription medications are relevant in assessing credibility.  Social Security Ruling 96-7p instructs an ALJ to consider many factors, including the treatment the individual has received and the effectiveness of medication, in assessing a claimant's credibility.  See SSR 96-7p (noting that [p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications .

. . [and] referrals to specialists . . . generally lend support to an individual's allegations of intense and persistent symptoms.").

Wall argues that the ALJ erred in relying on his observation of her at the hearing. The ALJ stated that he observed Wall at the hearing, noting that "although the claimant cried, sobbed and inhaled deeply throughout the hearing, she became very quiet and attentive during the questioning of the vocational expert, as the [ALJ] posed questions concerning her possible levels of restriction." (R. 23). The ALJ found Wall's attention during the questioning of the vocational expert consistent with a finding that she possesses at least fair capacities for attention and concentration. (R. 23). An ALJ's credibility determination is entitled to special deference because of his unique ability to observe and evaluate testimony. Powers, 207 F.3d at 435; see also Clifford, 227 F.3d at 869 (stating in conducting a substantial evidence determination, the court does not weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner). Although the Seventh Circuit has expressed discomfort with the "sit and squirm" test, it has endorsed the role of observation in credibility determinations. Powers, 207 F.3d at 436. Given the ALJ's subjective determination and his reliance on other factors in addition to his observations of Wall at the hearing, the Court cannot say the ALJ's credibility determination was patently wrong.

Wall also contends that the ALJ's credibility determination cannot stand because he failed to consider that she is unable to afford medications and intensive psychiatric care. Under SSR 96-7p, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other

information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Inability to afford treatment and inability to access free or low-cost medical services "may provide insight into the individual's credibility." SSR 96-7p.

The ALJ did not violate SSR 96-7p. Wall testified only that she could not afford multi-vitamins, St. John's Wort, and Milk Thistle recommended by Dr. Green but was able to get a prenatal multivitamin covered by public aid. (R. 346-47, 351, 352). Wall did not testify that she was unable to afford prescription medication or failed to pursue more intensive psychiatric care because of financial reasons. There is absolutely no evidence in the record that Wall was prescribed medication which she was unable to afford or that any medical source would have prescribed medication or recommended more intensive psychiatric care but for the fact that she could not afford them.

**E.      Step Five Determination**

Lastly, Wall challenges the ALJ's step five determination. Wall first argues that the ALJ's RFC finding and the hypothetical to the Vocational Expert (VE) did not incorporate all of her physical and mental impairments. The RFC is a description of those work activities a claimant can perform despite his limitations. Dixon, 270 F.3d at 1178. In assessing the claimant's RFC, the ALJ must consider both the relevant medical and nonmedical evidence in the record. See 20 C.F.R. § 416.945(a)(3). The ALJ determined that Wall retained the RFC to perform to perform the exertional requirements of light work limited to simple, unskilled work, learnable in 30 days or on short demonstration, involving only superficial contact with others, that could be performed independently, and not in close coordination with others. (R. 24).

The ALJ's RFC determination is supported by substantial evidence. The ALJ initially considered Wall's mental limitations. The ALJ noted that Wall was involuntarily hospitalized in June 2002 for generalized anxiety and psychosomatic complaints, including low blood sugar, shortness of breath, sweating and abdominal burning. (R. 19). The ALJ noted that on admission, Wall demonstrated limited insight, sad effect and soft, slurred speech. Id. The ALJ further noted that besides trembling, Wall appeared guarded, sleepy and unwilling to make eye contact. Id. Wall exhibited underactive psychomotor behavior and only questionable motivation. Id. The ALJ indicated that Dr. Avan assigned Wall a GAF of 30, which means inability to function outside a highly-structured environment. Id. The ALJ noted that at the time of her hospitalization, Wall was unemployed, overwhelmed taking care of a sick, elderly father whom she had just placed in a nursing home, involved in a court proceeding, and had an unpainted garage. Id.

The ALJ noted that by February 2005, Wall's stressors had changed slightly, but included inadequate finances, inadequate social support and disruption due to being a single parent undergoing a divorce. (R. 19). The ALJ also noted that Wall took no prescription psychotropic medication, only Milk Thistle and anti-oxidants prescribed by her primary care physician Dr. Green for chronic fatigue syndrome. Id. The ALJ observed:

> As of June 2002, Wall's lowest point, she still was fully-oriented and possessed [] normal memory and train of thought. She was well-groomed, and exhibited average intelligence. She denied hallucinations, obsessions or compulsion, including suicidal ideation. Her concentration was *focused* and she was cooperative.

(R. 19-20).

The ALJ discussed Wall's consultative evaluation with psychologist Alan Jacobs, Ph.D., on February 13, 2002. (R. 20, 22). The ALJ noted that on examination, Wall denied

crying spells, feelings of irritability, mood swings or tendencies to argue and fight. Id. The ALJ further noted that Wall did describe feeling alienated, isolated, and having long-term depression. Id. The ALJ indicated that Wall began crying in the interview as she spoke of unresolved issues of anger and acceptance. Id. Dr. Jacobs noted that Wall initially appeared anxious and eccentric, wore very heavy winter clothing that she buttoned tightly at the top, and spoke through her turtleneck sweater until asked to pull it below her chin. Id. The ALJ described Dr. Jacobs' findings of no paranoia, delusional thinking, looseness of association, flight of ideas or circumstantiality. Id. Wall was fully-oriented with fair memory and average pre-morbid intelligence. Id. The ALJ noted that Dr. Jacobs diagnosed moderate major depression and a history of chronic fatigue syndrome. Id.

The ALJ discussed psychologist Albert Keating's assessment of Wall. (R. 20). Keating wrote in August 2002 that Wall's level of distress ranged from moderate to severe. Keating further wrote that when Wall's depressive symptoms are elevated, she perceives fatigue in a more exaggerated manner, walks slower, shuffles and keeps her head down. The ALJ also noted that Keating found erratic cognitive and emotional functioning that limited more than basic functioning. Id. The ALJ summarized Keating's findings, including that Wall's ability to remain consistent on any occupational task would be moderately to severely limited, there are days when Wall is unable to feed herself or has others assist her with most household chores, and Wall would have significant challenges with any work-related tasks. Id.

The ALJ noted that Keating indicated he saw Wall every two weeks for a year and provided two similarly worded functional assessments in February 2005, shortly before the hearing. (R. 20). The ALJ again summarized Keating's findings. He noted that Keating

opined that Wall's perception of stress and physical symptoms exacerbate her physical condition.  Id.  The ALJ wrote despite a generally positive response to supportive cognitive behavioral therapy and the absence of need for psychotropic medications, Keating opined that Wall reasonably could be expected to have more than four monthly work absences. Id.  The ALJ also noted that Keating found that Wall was subject to fluctuating moods, tangential thinking and discouragement, and has only a fair-long term prognosis.  The ALJ indicated that Wall's primary care physician Dr. Green has only approved herbal remedies. (R. 21).

The ALJ discussed internal inconsistencies in psychologist Keating's opinions and inconsistencies with other substantial evidence in the record.  (R. 20-21).  The ALJ also based his assessment of Wall's RFC on the non-examining state agency medical consultants' findings.  (R. 21, 22).  In assessing Wall's residual functional capacity, the ALJ further considered Wall's description of her daily activities.  (R. 22).  The ALJ noted that in a December 2002 history, Wall reported that she lives at home, cooks, eats three meals a day, performs laundry and dishes as needed, shops (rarely), is independent in her personal care, takes no psychotropic medications, has good memory, no hallucinations, no delusions, picks up her child from school, drives, is able to leave home unaccompanied, sleeps well, enjoys people, is not afraid of people or aggressive, takes care of children, watches television, manages her finances, and goes to church.  Id.


The ALJ also discussed Wall's physical conditions of thoracic scoliosis, chronic fatigue, and mixed sensorineural hearing loss.  (R. 22).  The ALJ considered Dr. Green's, Dr. Rabinowitz's, and Dr. Turcotte's findings.  (R. 22-23).  The ALJ concluded that Wall's

chronic fatigue, thoracic scoliosis and hearing loss do not cause more than a minimal impact upon functioning and have not precluded work-related activity for a continuous twelve month period. (R. 23). Contrary to Wall's assertions, the ALJ explicitly considered her chronic fatigue. The ALJ's finding that Wall's chronic fatigue did not cause more than a minimal impact upon functioning and has not precluded work-related activity for a continuous twelve month period is supported by substantial evidence. The ALJ noted that Dr. Green last saw Wall in December 2004 and indicated that Wall's depression was stable. (R. 22, 253). The ALJ further noted that Dr. Green only prescribed herbs and prenatal vitamins. (R. 22). The ALJ also mentioned that in February 2004, Wall had a normal annual exam and no complaints. (R. 22, 262). Although Dr. Green completed a form in August 2003 opining that Wall's chronic fatigue was disabling, Dr. Green's treatment records do not contain any limitations on Wall's ability to perform work-related activities due to fatigue. Dr. Green's records also lack any detailed description of how Wall's chronic fatigue limits her ability to function.

Because substantial evidence supports the ALJ's rejection of Wall's allegations of disabling impairments, the ALJ need not consider and include these complaints in his RFC finding. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir.1997) (stating "[t]he ALJ should consider and discuss all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand."). Moreover, the hypothetical posed to the VE fairly addressed the limitations the ALJ found to be supported by the evidence. Cass v. Shalala, 8 F.3d 552, 555-56 (7th Cir. 1993).

Wall argues that the ALJ failed to follow SSR 00-4p. "SSR 00-4p requires an ALJ who takes testimony from a vocational expert about the requirements of a particular job to

determine whether the testimony is consistent with the Dictionary of Occupational Titles."

Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir. 2006).  SSR 00-4p states:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT, and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Id. (quoting SSR 00-4p).

Wall argues that the janitor and cleaner jobs mentioned by the ALJ in his decision are generic job titles, which encompass a variety of positions which are almost all categorized at a higher level of exertion than the light work specified in the hypothetical. The Commissioner concedes that the ALJ did not ask the VE if his answer to the hypothetical conflicted with the DOT.  (R. 362-64).  The Commissioner also concedes that Wall correctly points out that the ALJ mistakenly wrote that the vocational expert identified 9,800 janitor positions and 7,800 cleaner positions when, in fact, the vocational expert testified there were 9,800 janitor and custodian positions and 7,800 sorter positions which fit the hypothetical question.  The Court agrees with the Commissioner, however, that these errors  are harmless because substantial evidence supports the existence of a significant number of sorter jobs which are within the bounds of the hypothetical.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (stating "[s]o the administrative law judge's opinion is vulnerable.  But that is nothing new.  No principle of administrative law or common sense requires us to remand a case in quest of the perfect opinion unless there

is reason to believe that remand might lead to a different result.").

Prochaska, cited by Wall, does not compel a different result. In Prochaska, the ALJ failed to ask whether the VE's analysis conflicted with the DOT. Prochaska, 454 F.3d at 735-76. The government argued that the error was harmless because "for a significant number of the jobs that the ALJ cited, there were no inconsistences between the vocational expert's testimony and the DOT." Id. at 736. The claimant countered that each job defined by the DOT required specific physical capabilities that were beyond her limitations. For example, she pointed out that according to the DOT the packaging and assembly work identified by the expert required stooping, which the ALJ acknowledged she could not do. Id. The ALJ asked the vocational expert for work that could be done by someone who could only occasionally reach above shoulder level and it was not clear whether the requirements for the cashier position identified by the VE included reaching above shoulder level. Finally, the Seventh Circuit could not determine on the current record whether the expert's testimony regarding stooping or reaching was actually inconsistent with the DOT. Id. The Seventh Circuit remanded the case so that the ALJ could determine whether the job requirements identified by the vocational expert were in fact consistent with the definitions in the DOT and the claimant's limitations. Id.

In contrast, it does not matter here whether the VE's testimony was in conflict with the DOT with respect to the janitor and cleaner jobs. The Commissioner says, and Wall does not dispute, that the DOT lists the jobs of sorter as being at the light exertional level. Wall argues that there is a conflict between her missing more than four days a month of work, a moderate limitation in completing a normal workday or workweek, a moderate limitation in handling stress throughout the course of the day, and a moderate limitation in

concentration, persistence, and pace and the sorter jobs. The ALJ, however, did not find that Wall would miss more than four days a month of work, had a moderation limitation in completing a normal workday or workweek, had a moderate limitation in handling stress throughout the course of the day, or had a moderate limitation in concentration, persistence, and pace. As discussed above, the ALJ's RFC findings and the limitations he included in the hypothetical to the VE are supported by substantial evidence. Because there was no conflict between the VE's testimony and the requirements of the sorter job, the ALJ did not error in relying on the VE's testimony. Thus, unlike Prochaska, there is no unresolved potential inconsistency between the vocational expert's testimony and the DOT's requirements. The ALJ's failure to ask the VE whether his testimony conflicted with the DOT was not reversible error here because compliance with SSR 00-4p would not have changed the outcome.

Even assuming that Wall is unable to perform the janitor and cleaner jobs, the VE testified that there would still be a significant number of sorter jobs that Wall could perform. Seventy-eight hundred (7,800) sorter jobs is a significant number of jobs. See Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (holding 1,400 jobs is a significant number). The VE's testimony constitutes sufficient evidence for the ALJ's finding that Wall is capable of performing a significant number of jobs in the national economy.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment or Remand [19] is denied and Defendant's Motion for Summary Judgment [22] is granted. Pursuant to sentence four of 42 U.S.C. 405(g), the ALJ's decision is affirmed. The Clerk is directed to enter final judgment in favor of the Commissioner and against the Plaintiff in accordance with Rule 58 of the Federal Rules of Civil Procedure.

**E N T E R:**

_____

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: July 6, 2007**